

# NUMBER 13-24-00035-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL 278,
EDUARDO RODRIGUEZ, ESTEBAN J. CAVAZOS,
JERRY CASTILLO, DAVID L. MAYS JR.,
AVERY SANTOS, ANDREW SITTERLY JR.,
MIGUEL F. CARRANCO, MICHAEL DE LA CRUZ,
HECTOR CARRILLO, DAVID ROBERTS,
RONNIE FLORES, CONNOR HAMILTON,
ISRAEL LOPEZ, CHRIS HERNANDEZ,
CHRISTIAN SANCHEZ, AND JOSE A. MARTINEZ,                Appellants,

v.

CORPUS CHRISTI INDEPENDENT
SCHOOL DISTRICT, DON CLARK
IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE BOARD OF TRUSTEES,
S. JAIME ARREDONDO IN HIS OFFICIAL CAPACITY
AS VICE PRESIDENT OF THE BOARD OF TRUSTEES,
DOLLY GONZALEZ TROLLEY IN HER OFFICIAL CAPACITY
AS SECRETARY OF THE BOARD OF TRUSTEES,
ALICE UPSHAW HAWKINS IN HER OFFICIAL CAPACITY
AS ASSISTANT SECRETARY OF THE BOARD OF TRUSTEES,
JANE BELL IN HER OFFICIAL CAPACITY

**AS AT-LARGE TRUSTEE,
MARTY BELL IN HIS OFFICIAL CAPACITY
AS DISTRICT 3 TRUSTEE, AND
ERIC VILLARREAL IN HIS OFFICIAL CAPACITY
AS DISTRICT I TRUSTEE,** Appellees.

---

## ON APPEAL FROM THE 214TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva
Memorandum Opinion by Justice Benavides**

Appellants the International Brotherhood of Electrical Workers, Local 278 (IBEW), Eduardo Rodriguez, Esteban J. Cavazos, Jerry Castillo, David L. Mays Jr., Avery Santos, Andrew Sitterly Jr., Miguel F. Carranco, Michael De La Cruz, Hector Carrillo, David Roberts, Ronnie Flores, Connor Hamilton, Israel Lopez, Chris Hernandez, Christian Sanchez, and Jose A. Martinez (collectively, the Workers) filed suit against appellees Corpus Christi Independent School District (the District), Don Clark in his official capacity as President of the Board of Trustees, S. Jaime Arredondo in his official capacity as Vice President of the Board of Trustees, Dolly Gonzalez Trolley in her official capacity as Secretary of the Board of Trustees, Alice Upshaw Hawkins in her official capacity as Assistant Secretary of the Board of Trustees, Jane Bell in her official capacity as At-Large Trustee, Marty Bell in his official capacity as District 3 Trustee, and Eric Villarreal in his official capacity as District I Trustee (collectively, the Board of Trustees), seeking a declaration that the District and Board of Trustees' prevailing wage rate determination

2

violated Chapter 2258 of the government code, and requesting injunctive relief regarding the District and Board of Trustees' enforcement of its prevailing wage rate determination. *See* Tex. Gov't Code Ann. § 2258.022(a).

By three issues that we interpret as two, IBEW and the Workers argue that the trial court erred by granting the District and the Board of Trustees' traditional motion for summary judgment and by denying their traditional motion for summary judgment. We affirm in part and reverse and remand in part.

## I.    PREVAILING WAGE RATES

Prior to turning to the facts before us, it is necessary to discuss the subject matter with which this case deals. During the Great Depression, the Texas Legislature adopted the first iteration of its prevailing wage rates law, explaining via statute that it was spurred by a desire to protect workers on public works projects from poor treatment by unscrupulous employers:

> [T]here is no adequate law protecting laborers, workmen and mechanics engaged in doing and performing work on public works in Texas and its political subdivisions, and the further fact that many contractors are taking advantage of the present industrial and economic condition to beat down wages to a level far below that required to maintain a laborer, workman or mechanic in reasonable circumstances, and . . . this condition has created a social problem demanding the immediate attention of the legislative department of our State . . . .

*See* Act of March 23, 1933, 43rd Leg., R.S., ch 45, § 7, 1933 Tex. Gen. Laws 91, 94 (amended 1993) (current version at Tex. Gov't Code Ann. § 2258.022).

Under this law, for public works projects, the State's political subdivisions are required to "determine the general prevailing rate of per diem wages in the locality in which the public work is to be performed." Tex. Gov't Code Ann. § 2258.022(a). The

public body may make this determination by either: (1) "conducting a survey of the wages received by classes of workers employed on projects of a character similar to the contract work in the political subdivision of the state in which the public work is to be performed"; or (2) "using the prevailing wage rate as determined by the United States Department of Labor in accordance with the Davis-Bacon Act (40 U.S.C. Section 276a et seq.), and its subsequent amendments." *Id.*

The prevailing wage rate represents the floor, not the ceiling, of what contractors and subcontractors that are awarded a public works contract by a political subdivision must pay their workers. *Id.* § 2258.023(a). The purpose of the Act "is two[]fold: (1) To inform the bidder/contractor of the wages he must pay his employees engaged in work on public contracts, and (2) to protect the workman from working at rates below the prevailing wages in the locality." *Cullipher v. Weatherby-Godbe Constr. Co.,* 570 S.W.2d 161, 164 (Tex. App.—Texarkana 1978, writ ref'd n.r.e.).

## II.    BACKGROUND

On May 17, 2023, IBEW and the Workers filed their original petition which alleged that the District and its Board of Trustees' prevailing wage rate determination was unlawful, because they did not adopt the wage rates "determined by the United States Department of Labor in accordance with the Davis-Bacon Act," nor did they conduct their own compliant survey of wage rates within the District's boundaries. *See* TEX. GOV'T CODE ANN. § 2258.022(a). IBEW and the Workers further alleged that the prevailing wage rate determination was improper because it was based "on information compiled by a third party" that may not have been "limited to the geographic area covered by [the District]."

4

Although IBEW and the Workers did not use the term "*ultra vires*" to describe their claim of illegality, the District and the Board of Trustees have acknowledged that the claim is substantively an *ultra vires* claim.

IBEW also represented that it "is an unincorporated association representing employees performing electrical work and associated trades in the Corpus Christi area, including in Nueces County and the jurisdiction of the [District]." And the individual Workers are "Texas residents who perform electrical work and associated trades in the Corpus Christi area, including in Nueces County and the jurisdiction of the [District]." The petition further alleged that several of the individual Workers pay property taxes that help fund the District and its projects. The District and the Board of Trustees filed a joint answer, generally denying the claims raised and asserting as an affirmative defense, *inter alia*, that IBEW and the Workers lacked standing.

On November 14, 2023, IBEW and the Workers filed their traditional motion for summary judgment, arguing that the evidence established as a matter of law that the District and its Board of Trustees failed to comply with the government code in reaching its prevailing wage rates determination. Attached to the motion for summary judgment were materials from the January 23, 2023 Board of Trustees meeting in which it adopted the prevailing wage rates at issue, the United States Department of Labor's determination of the prevailing wage rates for Aransas, Nueces, and San Patricio Counties, the District and the Board of Trustees' responses to IBEW and the Workers' interrogatories, Texas A&M University's determination of the minimum prevailing wage rate for Nueces County, a map delineating the District's geographical boundaries within the larger boundary of

5

Nueces County, an email sent from David Carranco, the business manager of IBEW, to the Board of Trustees, and an informational sheet circulated by IBEW to the Board of Trustees regarding its prevailing wage rates determination.

According to the action item that was later approved by the Board of Trustees at their January 23, 2023 meeting, the District decided to "use Texas A&M University System's most recent prevailing wage rates approved in 2019" in determining its own prevailing wage rates. This action item represented that "[t]he Texas A&M University System has developed current prevailing wage rates for Nueces County. The average rates were developed by surveying classes of workers on public projects in the local area, surveying classes of workers on public projects statewide, and comparing the Department of Labor's rates under the Davis-Bacon Act."

According to the email sent from IBEW to the Board of Trustees, the Board's "decision to adopt a new prevailing wage package" was associated with "the new Nov. 22 Bond projects that . . . just passed." IBEW represented in the information it sent to the Board of Trustees that Texas A&M University's prevailing wage rates "are not comparable to what the market is currently bearing in Corpus." IBEW also felt that the below-market wages would "cause a financial hardship on the worker and their families."

On November 14, 2023, the District and the Board of Trustees also filed their traditional motion for summary judgment, arguing that IBEW and the Workers' claims were foreclosed as a matter of law because: (1) IBEW and the Workers lacked standing to sue; (2) the determination was final and unreviewable by the judiciary; and (3) the prevailing wage rate determination accorded with the government code's requirements.

6

The District attached to its motion a declaration by John Dibala, the District's construction project manager, as well as data from the Workforce Solutions of the Coastal Bend regarding hourly wages for certain laborers.

This motion for summary judgment represented that

[i]t is undisputed that [the District and Board of Trustees] opted not to adopt the Davis-Bacon wage rates (although the District did gather and consider those wage rates as part of its overall survey of wages).

Instead, the District reviewed various sources of information about wages in and around Nueces County to determine the prevailing wage rates for the District's public work projects." In his declaration, Dibala represented that he and another individual "were responsible for gathering and analyzing information regarding wages typically received by construction workers in Nueces County in order to make a recommendation to the Board of Trustees" regarding appropriate prevailing wage rates. In fulfilling this responsibility, Dibala "reviewed various sources of local wage rates, including speaking to local contractors, reviewing multiple local wage rate surveys (including a survey of wages for Nueces County by Texas A&M University)," as well as the Department of Labor's wage rates under the Davis-Bacon Act. Dibala ultimately recommended the Board of Trustees "adopt the Texas A&M University prevailing wage survey as the prevailing wages for purposes of upcoming [District] construction projects." The District and Board of Trustees maintained that these efforts comported with the requirements of the government code.

The trial court granted the District's motion for summary judgment "in its entirety," denied IBEW and the Workers' motion, and ordered that IBEW and the Workers take

7

nothing on their claims. This appeal followed.

## III. STANDING

As a threshold matter, the District and the Board of Trustees contend that IBEW and the Workers lack standing to pursue their claims.

### A. Standard of Review

"A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). "'Texas standing requirements parallel the federal test for Article III standing,' such that a 'plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Reps.*, 647 S.W.3d 681, 690 (Tex. 2022) (*MALC*). As the supreme court has "repeatedly recognized, a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits; rather, a plaintiff lacks standing if its 'claim of injury is too slight for a court to afford redress.'" *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 696 (Tex. 2021).

"Generally, a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7 (Tex. 2011). "To have standing to challenge a governmental action or assert a public right . . . , a claimant generally must demonstrate that he has suffered a particularized injury distinct from that of the general public." *Texans Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 919 (Tex. App.—Austin 2010, pet. denied). "A plaintiff's general disagreement about the governing law or what the law should be does not suffice." *State v. Zurawski*, 690 S.W.3d

8

644, 657 (Tex. 2024).

"Standing is a component of subject-matter jurisdiction that cannot be waived and thus may be raised at any time, including on appeal." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 250 (Tex. 2023). "In evaluating standing, we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). A plaintiff has standing if he has suffered an actual or imminent injury that is concrete and particularized, there is a causal relationship between the plaintiff's injury and the defendant's conduct, and if the injury will likely be redressed by a favorable decision. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 486 (Tex. 2018). "Standing is also a question of law which we review de novo." *City of Port Isabel v. Pinnell*, 207 S.W.3d 394, 402 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.).

**B.    Analysis**

The District solely challenges the injury in fact element of standing. We address this element as it pertains to the standing of IBEW and the Workers in turn.

**1.    IBEW's Associational Standing**

An association has standing to sue on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *MALC*, 647 S.W.3d at 690–91. "In other words, associational standing requires establishing everything that an individual plaintiff would have to establish, plus satisfying additional

burdens that apply only to associational standing." *Id.* at 691. "[T]he party who invokes the courts' jurisdiction 'bears the burden of establishing these elements' of standing; it is not the duty of the other side, or of the courts, to negate them." *Id.* at 693.

IBEW is described as "an unincorporated association representing employees performing electrical work and associated trades in the Corpus Christi area, including in Nueces County and the jurisdiction of . . . Corpus Christi ISD." The organization contends that its members "'may be employed' on the projects for which the [District and the Board of Trustees] illegally determined prevailing wages." For support that this is sufficient to confer standing, IBEW cites to *San Antonio Building & Construction Trades Council v. City of San Antonio*, in which our sister court of appeals held that a labor organization had standing to seek a declaration that its workers were entitled to be paid prevailing wage rates. 224 S.W.3d 738, 744 (Tex. App.—San Antonio 2007, pet. denied).

In particular, IBEW relies on the following line of reasoning from our sister court of appeals:

> In their petition, the SABTC Plaintiffs pled that SABTC "is a labor council that is composed of and collectively represents affiliated local unions representing building and construction workers in the various crafts and trades of construction work in the San Antonio vicinity." According to the petition, SABTC brings suit "in its own name on behalf of itself and on behalf of the numerous construction workers comprising the membership of its affiliated local unions." In reviewing the record, we are satisfied that the SABTC Plaintiffs represent members who would have standing to sue in their own right and that this is not a manufactured lawsuit. As such, we hold that the SABTC Plaintiffs have standing.

*Id.* at 745.

However, in that case, the Fourth Court of Appeals had the benefit of reviewing a record that was developed by a bench trial, not competing motions for summary

10

judgment. *Id.* at 742. What exactly was in the record that convinced the Fourth Court of Appeals of SABTC's standing, we do not know, but because its holding was very clearly dependent on the record before it, we decline to expand its reasoning to the limited record before us. *See id.* at 745.

"[T]o establish associational standing, general references to members are usually insufficient." *MALC*, 647 S.W.3d at 692. IBEW does not assert that any of the individual Workers are members of its organization, nor does it identify any individual members of its organization that might have standing in their own right. Nor does it assert that *all* its members will be affected. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) ("This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity.").

"The mere likelihood that some member of an association would have individual standing has never been enough." *MALC*, 647 S.W.3d at 693*.* "The lack of specifically identified members—who are then subject to scrutiny to ensure that they would in fact have standing on their own—calls into question whether" IBEW "has established the first prong of associational standing." *See id.*

However, even if we are to assume that some of the named Workers are members of IBEW—which may be an eminently fair assumption—beyond a conclusory statement that these Workers "could be impacted by the illegal wage rates," IBEW does not identify how or why the prevailing wage rates will affect their members. The remote possibility that these Workers "could be" injured does not mean that they will be injured, and without

11

more evidence in the record indicating that they have suffered or will suffer a pecuniary injury, we cannot conclude that they have satisfactorily shown that they will suffer an injury in fact as a result of the District and Board of Trustees' conduct. *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008) (explaining that to demonstrate standing, an alleged injury "must be concrete and particularized, actual or imminent, not hypothetical"); *USAA Casualty Ins. Co. v. Letot*, 690 S.W.3d 274, 280 (Tex. 2024) ("To establish standing based on a perceived threat of injury that has not yet come to pass, the 'threatened injury must be certainly impending to constitute injury in fact'; mere '[a]llegations of possible future injury' are not sufficient." (quoting *In re Abbott*, 601 S.W.3d 802, 812 (Tex. 2020) (orig. proceeding) (per curiam)).

Accordingly, we conclude that IBEW has not adequately demonstrated its standing.

### 2. Individual Workers

However, in addition to raising the same hypothetical injury that we rejected above, Carranco, Rodriguez, Cavazos, Castillo, and Mays, Jr., represent that they "all pay property taxes that help fund" the District and its projects, and that their taxes are being used for unlawful purposes; namely, fulfilling the bond measures will require improper budgeting and spending on the District's part. As stated above, generally speaking, "[s]tanding requires an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a decision in the plaintiff's favor." *Abbott v. Harris County*, 672 S.W.3d 1, 8 (Tex. 2023). "However, Texas law has long recognized an exception to this particularity requirement for taxpayers seeking to 'enjoin the illegal expenditure of public

12

funds.'" *Perez v. Turner*, 653 S.W.3d 191, 199 (Tex. 2022); *see City of Austin v. McCall*, 68 S.W. 791, 794 (Tex. 1902) ("[I]t would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong, when the officers of those corporations assume, in excess of their powers, to create burdens upon property holders."). But suits based on taxpayer standing are "drastic," and a plaintiff pursuing a suit based on such a theory of standing must "bring himself strictly within the established rules" for doing so. *Perez*, 653 S.W.3d at 199 (quoting *Osborne v. Keith*, 177 S.W.2d 198, 200 (1944)). "To have standing as a taxpayer to challenge government expenditures, a plaintiff must show two things: '(1) that the plaintiff is a taxpayer; and (2) that public funds are expended on . . . allegedly illegal activity.'" *Jones v. Turner*, 646 S.W.3d 319, 323 (Tex. 2022).

The District does not dispute the taxpayer status of the individual Workers. Accordingly, our inquiry rests on whether public funds are or will be expended on an allegedly illegal activity. *See id.* Here, the taxpayer Workers allege that any payment of the prevailing wage rates determined by the District and Board of Trustees violates the law. And a taxpayer that alleges funds are being budgeted and directed toward improper recipients has sufficiently alleged an injury for purposes of standing. *Id.* at 324 ("[W]hen the law requires that a certain amount of money be directed to a specific service, and the plaintiff alleges that it is being directed and spent elsewhere, the taxpayer has alleged an illegal expenditure sufficient to confer taxpayer standing."); *see Perez*, 653 S.W.3d at 199 ("In *Jones v. Turner*, we recently decided that taxpayer standing applies when the allegation is that funds have been allocated illegally toward otherwise lawful ends."). This

is precisely what the Workers have alleged here; they maintain that any expenditure the District and its Board of Trustees makes to workers on public works projects would be illegal, as the method by which those wages were set exceeds the scope of their authority to determine the prevailing wage rate. *See* TEX. GOV'T CODE ANN. § 2258.022(a). Therefore, we conclude that the Workers have sufficiently shown that the proposed expenditures are allegedly illegal. *See Jones*, 646 S.W.3d at 323.

But generally, "in order to establish taxpayer standing a plaintiff must plead facts showing that the government is *actually* spending money on the allegedly illegal activity." *Andrade v. Venable*, 372 S.W.3d 134, 138 (Tex. 2012). And the District contends that the Workers have failed to show that any taxpayer funds have actually been expended. However, as for any suit involving an imminent future injury, a taxpayer seeking prospective relief "may maintain an action solely to challenge *proposed* illegal expenditures." *Williams v. Lara*, 52 S.W.3d 171, 180 (Tex. 2001) (emphasis added); *Texans Uniting for Reform & Freedom*, 319 S.W.3d at 920 ("As long as the public money has not yet been spent, the taxpayer is considered to have a justiciable interest in ensuring that the money not be spent illegally."); *Robinson v. Neeley*, 192 S.W.3d 904, 911 (Tex. App.—Dallas 2006, no pet.) ("The taxpayer may not sue to recover amounts already illegally expended, but may sue to stop proposed illegal expenditures."); *City of El Paso v. Pickett*, 662 S.W.3d 592, 599–600 (Tex. App.—El Paso 2022, no pet.) ("Here, Pickett does not challenge the City's ability to charge such a fee, but rather, he alleges the City is not permitted to expend the collected fees in the manner it intends. . . . Accordingly, we determine the City has failed to show Pickett did not properly

14

allege taxpayer standing.").

In other words, the taxpayer Workers need only show that the District plans to use their collected taxes to pay the challenged "prevailing wage rates." And to that end, Dibala's declaration that the prevailing wage rates were approved for "upcoming CCISD construction projects," and IBEW's email representing that the prevailing wage rates were associated with voter-approved bond packages constitutes some evidence that the District plans on making these allegedly illegal expenditures in the near future. *See* Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/upcoming, (last accessed, Nov. 4, 2024) (defining "upcoming" as "happening or appearing soon"). By their very nature, prevailing wage rates apply "only to the construction of a public work, including a building, highway, road, excavation, and repair work or other project development or improvement, *paid for in whole or in part from public funds*." TEX. GOV'T CODE ANN. § 2258.002(a) (emphasis added). Accordingly, we conclude that the taxpayer Workers have met the second prong necessary for taxpayer standing.

We will turn to the merits of the summary judgment motions as it pertains to the taxpaying Workers' claims.

### IV.    SUMMARY JUDGMENT

The Workers argue that the trial court's grant of summary judgment was improper, as the evidence showed the District did not comply with § 2258.022(a) of the Texas Government Code in making its prevailing wage rates determination.

**A.    Standard of Review**

"Summary judgment is proper when no genuine issues of material fact exist and

the movant is entitled to judgment as a matter of law." *Tex. Workforce Comm'n v. Wichita County*, 548 S.W.3d 489, 492 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)). "We review the trial court's grant of summary judgment de novo." *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). "On a traditional motion for summary judgment, the movant . . . must conclusively prove every essential element of his claim or defense as a matter of law." *George Fleming & Fleming & Assocs. v. Wilson*, 694 S.W.3d 186, 190 (Tex. 2024). "When the parties file competing summary judgment motions and the trial court grants one and denies the other, 'we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered.'" *Wichita County*, 548 S.W.3d at 492 (quoting *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015)). "Summary-judgment motions must stand or fall on their own merits, and the nonmovant has no burden unless the movant conclusively establishes its cause of action or defense." *Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 583 (Tex. 2023).

## B.    Analysis

The District maintains that its prevailing wage rate determination is not reviewable by the judiciary, as the applicable statute provides that "[t]he public body's determination of the general prevailing rate of per diem wages is final." TEX. GOV'T CODE ANN. § 2258.022(e). In support of its position, the District relies on *Texas Highway Commission v. El Paso Building & Construction Trades Council*, in which the supreme court held "that the action of the Highway Commission in determining and ascertaining the 'general prevailing rate of per diem wages' is final and not subject to review by the Courts in this

16

proceeding." 234 S.W.2d 857, 863 (Tex. 1950).

But at the time the supreme court made its decision, the prevailing wage rates law "did not provide a method for determining 'the general prevailing rate of per diem wages,'" and left the matter "entirely to the discretion of" the relevant public body. *Associated Gen. Contractors of Tex. v. City of El Paso*, 879 S.W.2d 318, 319 (Tex. App.—El Paso 1994, no pet.); *see* Act of March 23, 1933, 43rd Leg., R.S., ch 45, § 7, 1933 Tex. Gen. Laws 91, 94 (amended 1993). Since then, the Legislature amended the prevailing wage rates law to provide that a public body "*shall* determine" the prevailing wage rates by either: (1) "conducting a survey of the wages received by classes of workers employed on projects of a character similar to the contract work in the political subdivision of the state in which the public work is to be performed"; or (2) "using the prevailing wage rate as determined by the United States Department of Labor in accordance with the Davis-Bacon Act (40 U.S.C. Section 276a et seq.), and it subsequent amendments." TEX. GOV'T CODE ANN. § 2258.022(a)(1–2) (emphasis added); *see id.* § 311.016(2) ("'Shall' imposes a duty.").

Our sister court held, and we agree, that the changes in the prevailing wage rates law that followed the supreme court's decision in *Texas Highway Commission* fettered the discretion of public bodies such that they may no longer "set wage rates in any fashion they desire[]." *Associated Gen. Contractors of Tex.*, 879 S.W.2d at 320 ("[W]e must assume that by adding to the statute two specific, alternative methods for determining a prevailing wage rate the legislature intended to change the prior law."). And "[o]nly when such absolute discretion—free decision-making without any constraints—is granted are

17

*ultra vires* suits," like the one the Workers brought against the Board of Trustees, "absolutely barred." *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 163 (Tex. 2016).

"An *ultra vires* action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). "[A] government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co.*, 487 S.W.3d at 158. "Consequently, while § 2258.022(e) makes final the determination of prevailing wages by the [public body], nonetheless, if officials of this public body act *ultra vires* in setting such prevailing wages . . . then, in such case, the wage determination is no longer recognized as an act of the body itself, nor a final determination." *Samaniego v. Associated Gen. Contractors of Tex., Highway, Heavy, Utils. & Indus. Branch*, 668 S.W.3d 898, 907 (Tex. App.—El Paso 2023, no pet.); *cf. Hous. Belt & Terminal Ry. Co.*, 487 S.W.3d at 169 ("Under this common meaning of 'similar reliable data,' therefore, Krueger's authority to determine what data to use was limited—he must have chosen data 'alike in substance' to digital map data that was also 'fit to be relied upon.'"). Accordingly, we conclude that the trial court may review whether the Board of Trustees acted without legal authority in determining the prevailing wage rates by deviating from the two methods prescribed by § 2258.022(a). *See Samaniego*, 668 S.W.3d at 907; *Associated Gen. Contractors of Tex.*, 879 S.W.2d at 320 ("Although the courts possess no power to direct a specific method

18

for performing a required act, (for example, we could not order the City to use only one of the two acceptable methods for determining wage rate), the trial court does have subject matter jurisdiction to determine whether the City violated [§ 2258.022(a)] by failing to use one of its listed methods for determining prevailing wage rate.").

However, because "[t]he basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all," *Hall*, 508 S.W.3d at 238, "these suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). Accordingly, we conclude that the trial court was correct to dismiss the Workers' claims against the District.

At long last, we have finally reached the crux of this case: Does a fact issue exist as to whether the Board of Trustees complied with § 2258.022(a)'s parameters in making its prevailing wage rate determination? There is no dispute that the Board of Trustees did not choose to use the United States Department of Labor's prevailing wage rates under the Davis-Bacon Act. *See* TEX. GOV'T CODE ANN. § 2258.022(a)(2). Accordingly, the question is really whether the Board of Trustees conducted a compliant survey. *See id.* § 2258.022(a)(1). For two reasons, we conclude that a fact issue regarding this question exists.

First, the record reflects that the survey the Board of Trustees considered and ultimately selected relied on data from localities beyond the District's geographical boundaries. Specifically, the Board of Trustees represented that "[t]he Texas A&M

19

University System . . . prevailing wage rates for Nueces County . . . . were developed by surveying classes of workers on public projects in the local area, surveying classes of workers on public projects statewide, and comparing the Department of Labor's rates under the Davis-Bacon Act." However, the statute clearly contemplates that if the public body does not use the Department of Labor's prevailing wage rate determination, its own survey must be "of the wages received by classes of workers employed on projects of a character similar to the contract work *in the political subdivision* of the state in which the public work is to be performed." TEX. GOV'T CODE ANN. § 2258.022(a)(1) (emphasis added). It is undisputed that the District operates as a political subdivision. *See Guaranty Petrol. Corp. v. Armstrong*, 609 S.W.2d 529, 531 (Tex. 1980) (orig. proceeding) ("A political subdivision has jurisdiction over a portion of the State . . . . Members of the governing body of a political subdivision are elected in local elections or are appointed by locally elected officials . . . . Political subdivisions have the power to assess and collect taxes . . . ."); *cf. Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003) ("Governmental immunity . . . protects political subdivisions of the State, including counties, cities, and school districts."). Therefore, its survey should have been confined to its boundaries.

In *Samaniego*, our sister court held that a survey that exceeded the political subdivision's boundaries ran afoul of the statute's requirements.

> While the language included in § 2258.022(a)(1) does not provide a specific method that public bodies must use in conducting the survey—and, thus, leaves the chosen method largely within their discretion—to fulfill the legislature's intent, the data designed to be collected must reflect the 'prevailing rate of per diem wages' for each class of worker needed to execute the contract in the specific locality. *See id.* For example, a public

> body that sends surveys to plumbers in New York City to determine the prevailing wage rate of electricians in El Paso County would not be seeking the appropriate prevailing wage of the jurisdictional locality. In that scenario, the public actors would more likely be operating outside of the bounds of their discretion.

668 S.W.3d at 906.

In other words, at the risk of sounding repetitive, conducting a survey of the wages received in the political subdivision in which the work is to be performed means surveying the political subdivision in which the work is to be performed—not other political subdivisions. *See* TEX. GOV'T CODE ANN. § 2258.022(a)(1); *BankDirect Cap. Finance, LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("The text is the alpha and the omega of the interpretive process."). And here, the political subdivision in which the work is to be performed is the District's geographical boundaries; not Nueces County and not the state at-large.

But it is not clear from the record whether the Board of Trustees consulted a single source within the District's geographical boundaries. There are only two portions of the record that could arguably support the conclusion that the Board of Trustees specifically considered wage rates from within its political subdivision: (1) Dibala's representation that he "reviewed various sources of local wage rates, including speaking to local contractors [and] reviewing multiple local wage rate surveys (including a survey of wages for Nueces County by Texas A&M University)"; and (2) the representation that the Board of Trustees spoke to IBEW prior to its determination about prevailing wage rates in the area. Although parts of the District overlap with parts of Nueces County, they are not one and the same. Statistical information about wages in Nueces County may not accurately reflect that of

21

the District, and vice versa.

But even if the Board of Trustees considered some sources within its boundaries, it does not comport with the spirit of the statute to reject the results from the survey of wages within the political subdivision in favor of a survey of wages from outside the political subdivision. *See* TEX. GOV'T CODE ANN. § 2258.022(a)(1). And here, by all accounts, the District ultimately selected a survey that incorporated statewide data into its prevailing wage rate determination, rather than rely on local data.

Under the prior version of the statute, the Texas Attorney General's Office also rejected the view that a political subdivision's prevailing wage rate determination need not be specific to its locality:

> We believe that a state agency making a prevailing wage determination should select as the "locality" on which it bases such determination the political subdivision most nearly corresponding to the location of the work. In other words, if the work is to be performed within the corporate limits of a town, that town's limits should be considered the "locality" for article 5159a purposes rather than the entire county in which it is located. You suggest that the [Texas Department of Criminal Justice] construes the statute to permit a state agency making a prevailing wage determination the discretion to select as the "locality" whichever overlapping political subdivision it decided would have the lowest prevailing wages, in order to reduce its costs on the project. We reject this construction, because the purpose of the article—to protect workers in the immediate locality of the work from wages being driven down by payment of a lower rate than was the locally prevailing rate—would be undermined.

Tex. Att'y Gen. Op. No. DM-0025 (1991). Because the Board of Trustees ultimately based its prevailing wage determination on a survey that was not conducted within its political subdivision, we conclude that the evidence does not show, as a matter of law, that the Board of Trustees conducted a compliant survey. *See* TEX. GOV'T CODE ANN. § 2258.022(a)(1).

Second, a fact issue exists as to whether the Board of Trustees conducted a survey at all. The parties have argued extensively about what it means to "conduct[] a survey," as the phrase is used in the applicable statute, and both cite dictionary definitions that support their competing interpretations.

We do not doubt, as the Board of Trustees argues, that the statute affords it ample discretion in conducting its survey. The Legislature prescribes no specific methodology, no sample size requirements, and no required level of confidence in conducting the survey. But we cannot conclude, as the Board of Trustees also argues, that the statute permits public bodies to outsource their role as surveyor to another entity; here, Texas A&M University. The Board of Trustees complains that any other interpretation "would require . . . entities to have the resources and expertise to gather, evaluate, and determine wage rates from scratch, without relying on the work of other entities that have the resources to perform such work." Not so. If public bodies wish to cut costs by outsourcing their surveyal, the Legislature has already selected the entity off whom they may copy: the United States Department of Labor. *See id.* § 2258.022(a)(2). We have no doubt that if the Legislature wanted, it could add more entities to the list. But thus far it has failed to do so.

Therefore, viewing this evidence in the light most favorable to the Workers, we conclude that the trial court erred in granting the District and Board of Trustees' motion for summary judgment. *See Samaniego*, 668 S.W.3d at 904 (conducting a survey using "incomplete and improper data" would be an improper use of authority). We sustain the Workers' first issue in part and deny it in part.

23

However, because of the broad discretion afforded to public bodies, Dibala's act of "talk[ing] to local contractors about the typical wages paid to workers on construction projects in the area" and the Board of Trustees' act of speaking to IBEW about the wages received may ultimately prove sufficient upon further development of the record. If the wage rates determined by Texas A&M University for Nueces County are truly identical to the results of this informal survey, and this informal survey included sources within the District's boundaries, the Board of Trustees may have complied with § 2258.022(a)'s parameters. But to know whether that is true, the record must be further developed. Because a fact issue exists as to whether the District complied with § 2258.022, we necessarily determine that the trial court did not err by denying the Workers' motion for summary judgment. *See Wilson*, 694 S.W.3d at 190. Accordingly, overrule the Workers' second issue *in toto*.

## V.    CONCLUSION

We affirm in part and reverse and remand in part for further proceedings consistent with our judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
5th day of December, 2024.

24